



# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Case No. 10cr00139-WYD-01

UNITED STATES OF AMERICA,

  Plaintiff,

v.

ROCKY MOUNTAIN INSTRUMENT COMPANY,

  Defendant.

---

## RULE 11(c)(1)(A) and (B) PLEA AGREEMENT AND STATEMENT
## OF FACTS RELEVANT TO SENTENCING

---

The United States of America, by and through David M. Gaouette, United States

Attorney for the District of Colorado, Matthew T. Kirsch, Assistant United States Attorney, and

the defendant, Rocky Mountain Instrument Company (RMI), by its duly authorized

representative Steven Hahn and by counsel, Mark Meagher and Richard Kaufman, submit the

following Plea Agreement and Statement of Facts Relevant to Sentencing pursuant to

D.C.COLO.LCrR 11.1.

## I. PLEA AGREEMENT

Defendant RMI agrees to plead guilty to Count 1 of the Information charging a violation

of Title 22, United States Code, Section 2778(b)(2), Willful Export of Defense Articles Without

a License, and to admit the forfeiture allegation in the Information.

Defendant RMI and its representative agree to execute the necessary documents and

1

pleadings necessary to effect this plea agreement, including but not limited to the execution of minutes authorizing this plea agreement and the authorization for a representative to represent the corporation at sentencing.

Defendant RMI agrees and stipulates that, because is it not possible to specifically quantify what proceeds are traceable to RMI as a result of the violation to which it is pleading guilty, the amount of $1,000,000 will be considered proceeds of that violation. RMI also agrees that a money judgment in the amount of $1,000,000 is appropriate pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 1956(c)(7)(B)(v)(I), and Title 28, United States Code, Section 2461. RMI also agrees to cooperate fully in the forfeiture of this property, including executing all documents, stipulations, consent judgments, court orders, bills of sale, and affidavits of title which are reasonably necessary to pass clear title to the United States or otherwise effectuate forfeiture of the property, and to testify truthfully on behalf of the United States in any legal action necessary to perfect the United States' interest in any property subject to forfeiture, including any ancillary hearing in this criminal action or in any civil litigation.

Defendant RMI agrees to cooperate fully, honestly, without reservation, and affirmatively with the United States Attorney's Office for the District of Colorado (the "Government" or the "United States") and with any other federal, state, or local governmental department or agency designated by the Government ("designated agency") relating to any matter in connection with any regulatory or enforcement proceeding, whether, criminal, civil, or administrative, relating to or arising from any conduct as set forth in the Information or Statement of Facts. This includes the current enforcement proceeding by the United States Department of State but expressly

2

excludes the *qui tam* action in District of Colorado case number 09-cv-00562-PAB.[1]

RMI agrees that its continuing cooperation with the United States described above includes, but is not limited to, good faith efforts to do the following:

1. Completely and truthfully disclosing all information and materials in its possession to the United States that the United States or its designated agency may request, including, but not limited to, all information about the activities of RMI and present and former directors, officers, employees, consultants, representatives, agents, subsidiary entities, minority-owned entities, and affiliated entities, including Millennium Optical Systems, Optic Penta, and Octand;

2. Affirmatively, timely and in good faith providing to the United States any information and materials that comes to RMI's attention that may be relevant to any regulatory or enforcement proceeding described above;

3. Assembling, organizing, translating, and providing, in a responsive and prompt fashion, all information and materials in the possession, custody, or control of RMI as may be requested by the United States;

4. Using its good faith efforts to make available, at its cost, RMI's former directors, officers, employees, consultants, representatives, and agents to provide information and materials and to testify as requested by the United States, including sworn testimony before a grand jury or in any judicial proceeding and interviews with the

---

[1] Nothing in this agreement shall be construed as requiring that RMI produce any document, record, tangible evidence, communication or information that is protected currently from compelled disclosure by the attorney-client privilege or work-product doctrine. The United States will not consider RMI's payment of employees' attorneys' fees to be inconsistent with its obligation to cooperate created by this agreement.

DN:32179498.1

United States and designated agencies;

5. Making available in Denver, Colorado, at its cost, any current directors, officers, employees, consultants, representatives, and agents for interviews or testimony as requested by the Government in connection with any regulatory or enforcement proceeding described above, understanding that such directors, officers, employees, consultants, representatives, and agents may assert any applicable privilege against self-incrimination upon their appearance in Denver[2];

6. Affirmatively identifying witnesses and notifying the United States of witnesses who, to RMI's knowledge and information, may have material information concerning any regulatory or enforcement proceeding described above;

7. Providing information, materials, and testimony as necessary or requested to identify or establish the original location, authenticity, or other basis for admission into evidence of documents or physical evidence in any regulatory or enforcement proceeding described above;

8. Consenting to the disclosure of information or materials, which were initially obtained from RMI, to any designated agency as the United States, in its sole discretion, deems appropriate;

9. Obtaining, collecting, and providing to the United States in Denver, Colorado upon request, any information or materials, which RMI has contractual or business right or obligation to inspect, audit, and maintain and which are relevant to any criminal investigation;

---

2 The parties agree that this provision does not apply to Yubong Hahn absent an additional agreement between the United States and counsel for Dr. Hahn.

DN:32179498.1

10. Participating and cooperating in any other reasonable request by the United States in any law enforcement action, operation, transaction, procedure, or training;

11. Prominently posting through a link maintained at its home page on the world-wide web during the probationary period a copy of the Information, Plea Agreement, and Statement of Facts filed in this matter.

RMI agrees that its obligations to cooperate under this Agreement are continuing in nature and will continue beyond any period of probation, as long as any individual or entity is subject to investigation or prosecution in any related matter, including during the pendency of any appeal. RMI must continue to fulfill its duty to cooperate pursuant to this Agreement in connection with any regulatory or enforcement proceeding described above.

Defendant RMI acknowledges that nothing in this plea agreement limits the rights of any department or agency of the United States government to seek and take civil or administrative action against RMI, including but not limited to any action relating to suspension, debarment, or listing.

The Government agrees to recommend a sentence of five years of probation and no fine, with the following terms as conditions of probation:

1. RMI shall continue its cooperation as described above;

2. RMI shall develop and submit to the Court an effective compliance and ethics program, including a schedule for implementation of that program;

3. RMI shall make periodic reports to the Court or the Probation Office, on a schedule determined by the Court, regarding its progress in implementing the program described in (2). These reports shall disclose, among other things, any criminal prosecution, civil litigation, or administrative proceeding commenced against RMI, or

5                          DN:32179498.1

any investigation or formal inquiry by governmental authorities of which the organization learned since its last report.

The Government agrees that it will file no other federal criminal charges against defendant RMI or any of its subsidiaries based on matters currently known to the government or offenses based upon information provided by the defendant.

This plea agreement is made pursuant to Rule 11(c)(1)(A) and (c)(1)(B) of the Federal Rules of Criminal Procedure.

## II. **ELEMENTS OF THE OFFENSE**

The defendant understands that in order to prove its guilt as to Count 1, the government must prove, beyond a reasonable doubt, that:

A.    The defendant exported from the United States a defense article on the United States Munitions List or technical data relating to a defense article on the United States Munitions List;

B.    The defendant did not obtain a license or written approval for the export from the United States Department of State; and

C.    The defendant acted willfully, that is, with knowledge that its conduct was unlawful.[3]

## III. **MAXIMUM STATUTORY PENALTIES**

The maximum statutory penalty for the violation of Title 22, United States Code, Section 2278 in Count 1 by a corporation is not more than a $1,000,000 fine, not more than five years of probation, or both, and a $400 special assessment fee.

---

[3]*United States v. Reyes*, 270 F.3d 1158, 1169 (7th Cir. 2001); *Kuhali v. Reno*, 266 F.3d 93, 104 (2d Cir. 2001).

DN:32179498.1

## IV. STIPULATION OF FACTUAL BASIS AND FACTS RELEVANT TO SENTENCING

The parties agree that there is no dispute as to the material elements which establish a factual basis for the offense of conviction.

Pertinent facts are set out in the attached Appendix A in order to provide a factual basis of the plea and to provide facts which the parties stipulate are relevant, pursuant to §1.B1.3, for computing the appropriate guideline range.

The statement of facts in Appendix A does not preclude either party from presenting and arguing, for sentencing purposes, additional facts or factors not included herein which are relevant to the guideline computation (§1B1.3) or to sentencing in general (§1B1.4). Nor is the Court or Probation precluded from the consideration of such facts. In "determining the factual basis for the sentence, the Court will consider the stipulation [of the parties], together with the results of the presentence investigation, and any other relevant information." (§6B1.4 Comm.)

The parties agree that the government's evidence would show that the date on which conduct relevant to the offense (§1B1.3) began is approximately April 1, 2005. The parties agree that the Statement of Facts attached to this agreement as Appendix A is true and correct.

## V. SENTENCING COMPUTATION

Any estimation by the parties regarding the estimated appropriate guideline application does not preclude either party from asking the Court to depart from the otherwise appropriate guideline range at sentencing, if that party believes that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the sentencing guidelines. (§5K2.0)

The parties understand that the Court may impose any sentence, up to the statutory

7

maximum, regardless of any guideline range computed, and that the Court is not bound by any position of the parties. (§6B1.4(d)) The Court is free, pursuant to §§6A1.3 and 6B1.4, to reach its own findings of facts and sentencing factors considering the parties' stipulations, the presentence investigation, and any other relevant information. (§6B1.4 Comm.; §1B1.4)

To the extent the parties disagree about the sentencing factors, the computations below identify the factors which are in dispute. (§6B1.4(b)) New facts which arise or are discovered may cause a party to change its position with regard to guideline computations or sentencing. The parties' estimated guideline application for Count 1 is:

A.  The sentence should be determined with reference to Chapter 8 of the sentencing guidelines. U.S.S.G. §8A1.2 *et seq.*

B.  Restitution should not be imposed because determining complex issues of fact related to the amount of the victims' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process. U.S.S.G. §8B1.1(b)(2). The Court may impose a remedial order to require RMI to remedy the harm caused by the offense and to eliminate or reduce the risk that the instant offense will cause future harm. U.S.S.G. §8B1.2(a). There are no other applicable policy statements under Part B.

C.  The appropriate fine should be determined by applying the provisions of 18 U.S.C. §§ 3553 and 3572 because the count of conviction is not covered under §8C2.1. U.S.S.G. §8C2.10. As noted above, the maximum fine is $1,000,000.

D.  The terms of probation should be determined by applying Part D of Chapter 8, U.S.S.G. §8D1.1 *et seq.* As noted above, the maximum term of probation is five

8                                    DN:32179498.1

years.

E.  A special assessment of $400 should be imposed.  U.S.S.G. §8E1.1, App. N.2.

## VI.  WHY THE PROPOSED PLEA DISPOSITION IS APPROPRIATE

The parties believe the sentencing range resulting from the proposed plea agreement is appropriate because all relevant conduct is disclosed, the sentencing guidelines take into account all pertinent sentencing factors with respect to this defendant, and the charge to which the defendant has agreed to plead guilty adequately reflects the seriousness of the actual offense behavior.

This document states the parties' entire agreement.  There are no other promises, agreements (or "side agreements"), terms, conditions, understandings or assurances, express or implied.  In entering this agreement, neither the United States nor the defendant have relied, or are relying, on any terms, promises, conditions or assurances not expressly stated in this agreement.

6/7/2010
Date

Steven Hahn, Authorized Representative of
Rocky Mountain Instrument Company, Defendant

6/8/2010
Date

Mark Meagher
Attorney for Defendant

6/8/2010
Date

Richard Kaufman
Attorney for Defendant

6/9/2010
Date

Matthew T. Kirsch
Assistant U.S. Attorney

9

## Background

Rocky Mountain Instrument Company ("RMI") is an optics manufacturer located in Lafayette, Colorado. RMI is owned by the Hahn Family LLLP. Dr. Yubong Hahn is the managing partner of the Hahn Family LLLP. RMI is closely affiliated with two other optics manufacturers, Optic Penta, a wholly-owned subsidiary located in Moscow, Russia, and Millennium Optical Systems ("MOS"), located in Seoul, South Korea. According to corporate documents, MOS is not a subsidiary of RMI and is owned by three individuals who are proxies for Dr. Yubong Hahn, the managing partner of the Hahn Family LLLP. RMI frequently serves as subcontractor to various defense contractors who in turn have contracts with the United States Department of Defense ("DOD") and other branches of the federal government to produce electro-optical systems, optics, coatings and assemblies.

## RMI's Registration/Licensing History

In late March, 2005, RMI made a voluntary disclosure to the Office of Defense Trade Controls Compliance ("DTCC"), United States Department of State. This disclosure indicated that RMI violated implementing regulations for the Arms Export Control Act, 22 U.S.C. § 2778, known as the International Traffic in Arms Regulations ("ITAR"). Specifically, the disclosure indicated that RMI had sent technical data in the form of a technical drawing of a Schmidt corrector, development optic to Quality Laser Optics, Ltd., located in the United Kingdom, without first obtaining an export license from the DTCC as required by the ITAR. The disclosure also indicated that "processes have been put in place to review documents and drawings for ITAR requirements/specifications prior to release to firms outside the US." These processes were said to include a request from RMI to "all . . . clients that follow ITAR requirements and regulations to sate [sic] such in each quote and drawing as a specification."

Appendix A – Statement of Facts

The disclosure included a certification by RMI's Quality Systems Manager that all representations contained in the disclosure were true and correct.

Based on the information provided by RMI, the DTCC imposed no civil or other penalties on RMI in relation to the unauthorized export of the technical data described above. DTCC did, however, require RMI to provide it with detailed compliance procedures related to future exports of ITAR-controlled material.

On June 22, 2005, an executive at RMI circulated a modification of RMI's contract review procedure aimed at satisfying DTCC's requirement that RMI implement detailed compliance procedures. This draft was sent to several RMI executives. The initial draft of these procedures contained a process in which RMI's Quality Systems Manager would have responsibility for ensuring that no technical data contained in drawings or other items on the United States Munitions List ("USML") would be exported without first obtaining appropriate licenses.

On July 5, 2005, RMI submitted is final contract review procedure to DTCC. This procedure required RMI "Executive Management" to review with individual sales people any quotes involving any product for export found on the USML. The procedure forbid the transmission of any technical drawings to subcontractors outside the United States "prior to discussion with Executive Management for review of regulations." Copies of this procedure were distributed to RMI's Executive Management and its sales team.

Around the same time as RMI's first voluntary disclosure, on March 30, 2005, RMI filed a statement of registration with the DTCC. The statement was signed by a senior officer of RMI, as is required by the ITAR. In signing the statement, RMI's officer warranted the truth of the information it contained. In that statement, RMI indicated that it was a manufacturer and

exporter of items including optics and optical components covered by Category XII, fire control, range finder, optical and guidance control equipment, of the USML. In the initial version of this statement, the section in which names and addresses of the registrant's wholly and partially-owned foreign subsidiaries should have been listed was left blank. In the final version of this statement, signed on June 10, 2005, the "no" box in this section was filled in, falsely indicating that RMI did not have any ownership interest in foreign subsidiaries. On April 5, 2005, an RMI senior officer signed a letter, under penalty of perjury, in which he indicated that he would oversee RMI's export compliance program and would have responsibility for designating "empowered officials" to act on behalf of RMI with respect to export licensing.

DTCC sent RMI a letter notifying the company of its registration on June 15, 2005. That letter contained references to applicable export laws and regulations, including the ITAR, and to sources of information for answering questions about whether particular items require export licenses. The letter also informed RMI that violations of the ITAR could result in loss of export privileges or criminal charges.

On April 5, 2006, RMI submitted another statement of registration to the DTCC. A senior officer of RMI again signed this statement under penalty of perjury, and it again indicated that RMI had no wholly- or partially-owned foreign subsidiaries. In May, 2007, despite having twice denied to DTCC that RMI owned any foreign subsidiaries, RMI sent a request to DTCC about the possibility of registering MOS and Optic Penta as "sister companies" of RMI. DTCC's response informed RMI that a U.S. company cannot register a foreign subsidiary or sister company, that such a foreign company could register only as a broker, and that a U.S. company would still require an export license to send ITAR-controlled materials or data to a registered broker.

# Appendix A – Statement of Facts

On August 1, 2007, RMI submitted another statement of registration, signed by a senior officer, which also indicated that RMI had no wholly- or partially-owned foreign subsidiaries. DTCC's letter to RMI confirming that its registration had been renewed also included a detailed compliance guide re: ITAR controls.

After registering with DTCC in 2005, RMI applied for a number of export licenses, as reflected in the chart below:

| Application Date | License Type | Item | Foreign Destination | Result |
|---|---|---|---|---|
| 8/15/2005 | DSP5 | Technical drawing no. 2220624 Rev. A | Quality Laser Optics, Ltd., Isle of Man, UK | Granted |
| 9/27/2005 | DSP5 | Technical drawing no. 2220624A | Quality Laser Optics, Ltd., Isle of Man, UK | Granted |
| 12/2/2005 | DSP5 | Technical drawing no. 2220624A | Quality Laser Optics, Ltd., Isle of Man, UK | Granted |
| 6/13/2007 | DSP5 | Technical drawing nos. 4991051, No. 4 Optical Lens, 4991052, No. 5 Optical Lens, 4991050,[1] No. 1 Optical Lens | MOS | Rejected |
| 7/25/2007 | DSP5 | Technical drawing no. 3227191 Prism, Risley | MOS | Rejected |

In addition to RMI's applications for discrete export licenses, on June 28, 2007, and again on August 1, 2007, RMI submitted an application to the DTCC for a Technical Assistance Agreement (TAA). The purpose of the TAA, according to the application, was to "allow the

---

[1]RMI had previously exported this drawing without requesting a license to do so. See violation number 4, described below.

electronic transfer of ITAR-controlled technical drawings" from RMI to MOS "to facilitate price quoting and technical data sharing and interaction between personnel." Although the TAA application indicated at one point that RMI was the end-user of the drawings, the application also indicated that the finished optics would be used in various military and aerospace products. The application was also misleading in that it indicated that none of the technical data that was sought to be exported to MOS was derived from any bid or proposal to the U.S. government, despite the fact that many of the drawings were specific to items being produced exclusively in connection with DOD contracts. DTCC approved the TAA approximately a month after it was submitted in August.

## Export Violations

### 1. Prisms Sent to Ankara, Turkey

On or about November 10, 2006, a company called Aselsan, located in Ankara, Turkey, sent RMI a purchase order for 30 pairs of part number 10019390+ (Prism, Risley), 13 pairs of part number 3227191-1 (Prism, Risley), and testing costs. The purchase order costs totaled $16,865.00. On February 5, 2007 RMI received a wire transfer in the amount of $16,865.00 for payment this on purchase order.

On February 6, 2007, the U.S. Customs and Border Protection (CBP) Anti-Terrorism Contraband Enforcement Team (A-TCET), Area Port of Chicago, IL, inspected a shipment marked as follows:

> AES ITN: X20070202043556
> Description: Lenses, Prisms, and Mirrors, Unmounted
> Schedule B: 9001901000
> Consignee: Aselsan    Destination: Ankara, Turkey
> MAWB: 235-50263592    HAWB: 4160079067    Flight: TK 006
> Freight Forwarder: Expeditors Int'l in Aurora, CO

The A-TCET determined that the shipment contained forty-three prisms.

On February 7, 2007, a CBP Inspector requested an end-use statement from an RMI employee for this shipment. RMI was apparently unaware of the end-use of the product and contacted the final consignee, Aselsan, to request an end-use statement from it. This end-use statement, which RMI then provided to Inspector Thomas, stated, "The materials are used in the production of AESLFLIR 300T (Thermal Sight Systems integrated into TIHA/Turkish UAV) systems Project. The platform will be Unmanned Aerial Vehicle (UAV) systems. Platform is MALE (Medium Altitude Long Endurance) type, which will be used for surveillance purposes. It is unique to the military program."

The Shipper's Export Declaration, which is filed electronically by the shipper in connection with a shipment, claimed there was no license required for this shipment. CBP requested a license determination for the prisms contained in this shipment through the ICE Headquarters Exodus Command Center. DTCC responded to this license determination request and indicated that the prisms were subject to the ITAR under Category XII(e), Fire Control, Range Finder, Optical and Guidance and Control Equipment. DTCC's response stated, "The majority of RMI's work is custom optics. These prisms have an Anti-Reflective coating specified by the ultimate consignee and have special dimensions specified by the ultimate consignee. As the application has been defined in the end use documents provided by the ultimate consignee,

these parts are considered specially designed for military applications. As specially designed for

military application parts the prisms would be subject to the ITAR regulations and the USML."

Upon CBP's request, RMI could produce no license authorizing exportation of these prisms to

Aselsan in Turkey.

TheCBP Inspector contacted the same RMI employee, who provided Rocky Mountain

Instrument's DTCC registration information. The employee stated that she did not know if RMI

had previously exported the type of prisms contained in the intercepted shipment. The employee

stated that the company was unaware Aselsan was doing defense work until Aselsan sent them

the completed end-use statement following CBP's request. On April 4, 2007, the A-TCET

contacted RMI's Quality Systems Manager, who handled licenses for the company at the time.

RMI's Quality Systems Manager stated that he was then preparing a DSP-05 application for the

shipment to Aselsan in Turkey. DTCC has no record, after April 4, 2007, of receiving any

application from RMI to export the type of prisms sent to Aselsan in the shipment in question.

2.  Technical Drawing Titled: "Prism, Penta," Northrop Grumman Technical Drawing No.
82000075 and RMI's Copy

On November 30, 2006, RMI provided a response to a Request for Quotation (RFQ) from

Litton Systems, Inc., a wholly owned subsidiary of Northrop Grumman Electrical Systems

(Northrop Grumman), to provide optics including a Prism, Penta, as described in Northrop

Grumman Technical Drawing No. 82000075. On December 1, 2006, RMI received a Purchase

Order from Northrop Grumman to provide 50 Prism, Penta as described in Northrop Grumman

Technical Drawing No. 82000075. The Purchase Order indicated that the optics would be used

to fulfill a DOD contract and provided the DOD contract number. The Purchase Order contained

the following notice:

Requirements for NGLS (Northrop Grumman Laser Systems) are controlled by and subject to the International Traffic in Arms Regulations (ITAR); therefore A) Supplier must notify the buyer if any foreign national will have (1) access to technical/intellectual data in support of or (2) access to the actual item(s) that are included in this order B) Supplier must also advise buyer if supplier or supplier's parent company is other than U.S. owned.

Northrop Grumman Technical Drawing No. 82000075 also contained the following notice pertaining to the Northrop Grumman technical drawing:

This information is hereby identified as Technical Data as defined by 22 CFR § 120.10 of the U.S. International Traffic in Arms Regulations (ITAR). As such, all reexport, or retransfer to an end use, end user, or destination not previously authorized is STRICTLY prohibited.

The prism described in this drawing is a part of the U.S. Army Future Combat Systems Multi-Function Laser System.

On December 8, 2006, an RMI employee sent a purchase order for 65 prisms (DWG # PENTA 1(82000075-1) to Opticom Russia (a company which is affiliated with Optic Penta), Moscow, Russia. In addition to the Purchase Order, the RMI employee sent to Opticom RMI Technical Drawing No. Penta 01 (82000075-1), a version of Northrop Grumman technical drawing 82000075 which had been copied by an RMI administrative assistant to remove the references to RMI'scustomer, Northrop Grumman, as well as the ITAR control legend. Subsequent testing, inspection, and other technical review of these prisms was conducted by a foreign national employee working at RMI.

Both Northrop Grumman Technical Drawing No. 82000075-1 and RMI Drawing No. Penta 01 (82000075-1) constitute technical data covered by Category XII(f) of the USML and therefore required a license before they were exported to Russia or provided to a foreign national. RMI never obtained export licenses before making these exports.

<u>3.</u>     <u>Technical Drawing Titled: "Prism, Laser," Lockheed Martin Drawing No. 79705586-001</u>
<u>and RMI's Copy</u>

On November 22, 2006, and again on March 9, 2007, RMI received a RFQ from

Lockheed Martin to provide a laser prism as described in Lockheed Martin Technical Drawing

No. 79705586-001. (RMI had previously provided the same prism to Lockheed Martin in 2005,

when it had been informed that the prism was priority-rated for a DOD contract.) On March 13,

2007, RMI prepared a job order to Lockheed Martin for three of these prisms. The RMI job

order indicated a priority rating for Lockheed Martin's contract, demonstrating that RMI was

aware that this prism was being manufactured in connection with a DOD contract. This prism is

used in the U.S. Air Force Gunship Multispectral Sensor System for the AC-130 Gunship. At

least for the 2007 order, RMI had this prism produced at Optic Penta. On approximately March

16, 2007, and again on April 23, 2007, in connection with Optic Penta's production of the prism,

RMI sent to Optic Penta RMI Technical Drawing No. A0311607, a version of Lockheed Martin

Technical Drawing No. 79705586-001 which had been copied by an RMI administrative

assistant to remove references to RMI's customer, Lockheed Martin. On May 4, 2007, RMI sent

the original Lockheed Martin drawing to Optic Penta because the RMI copy contained errors.

Optic Penta shipped ten of the prisms to RMI on May 31, 2007.

Both Lockheed Martin Technical Drawing No. 79705586-001 and RMI Technical

Drawing No. A0311607 constitute technical data covered by Category XII(f) of the USML, and

therefore required a license before they were exported to Russia. RMI never obtained export

licenses before making these exports.

4.    Technical Drawing Titled: "Doublet, No. 1, RTS," Raytheon Company Technical

Drawing No. 4991050 and RMI's Copy

On December 8, 2006, RMI received a RFQ from Elcan Optical Technologies, a

Raytheon Company, to produce optics including a doublet lens described in Raytheon Company

Technical Drawing No. 4991050. The RFQ indicated that Raytheon's terms and conditions of

purchase applied, including those requiring suppliers to comply with applicable export controls

and a provision forbidding disclosure by a supplier of any of Raytheon's drawings to a third

party without Raytheon's express written consent. Raytheon's drawing contained the following

legend:

> THIS DOCUMENT CONTAINS DATA WHOSE EXPORT/TRANSFER/
> DISCLOSURE IS RESTRICTED BY U.S. LAW. DISSEMINATION TO NON-U.S.
> PERSONS WHETHER IN THE UNITED STATES OR ABROAD REQUIRES AN
> EXPORT LICENSE OR OTHER DETERMINATION.

This lens is used as part of the remote thermal sight for one of the weapons systems on the

Abrams tank.

In January, 2007, RMI solicited a bid from MOS to make this lens. On January 18, 2007,

as part of this process, RMI sent to MOS a version of the Raytheon drawing from which RMI

had removed Raytheon's name, drawing number, and the export legend above.

In March, 2007, Raytheon placed an order for 1,368 of these lenses from RMI. The

March purchase order referenced the DOD contract number and priority rating for which

Raytheon was purchasing the lenses, as did RMI's paperwork related to this order. In April,

2007, RMI provided information to Raytheon as a part of a supplier capabilities assessment. As

part of that process, RMI told Raytheon that "we apply for licenses as required for ITAR

products." By at least June, 2007, MOS was shipping these lenses to RMI. Around that same time, an RMI sales person sent an email to recipients including a foreign national employee at RMI which explained that these lenses were part of a .50 caliber gun sight then being used by troops in Iraq and that they were, in the view of this sales person, part of a "critical program for the war."

Raytheon Company Technical Drawing No. 4991050 constitutes technical data covered by Category XII(f) of the USML and therefore required a license before it was exported to South Korea. RMI never obtained an export license before making this export or before providing the drawing to a foreign national working at RMI. As noted above in the licensing history section, RMI applied for a license to export the technical drawing for this lens to MOS after it had begun receiving the completed lenses from MOS.

5.    Technical Drawing Titled: "Prism, Lens No. 3," Raytheon Company Technical Drawing No. 4991064 and RMI's Copy

On December 8, 2006, RMI received a RFQ from Elcan Optical Technologies, a Raytheon Company, to produce optics including a prism lens described in Raytheon Company Technical Drawing No. 4991064. The RFQ indicated that Raytheon's terms and conditions of purchase applied, including those requiring suppliers to comply with applicable export controls and a provision forbidding disclosure by a supplier of any of Raytheon's drawings to a third party without Raytheon's express written consent. Raytheon's drawing contained the following legend:

> THIS DOCUMENT CONTAINS DATA WHOSE EXPORT/TRANSFER/
> DISCLOSURE IS RESTRICTED BY U.S. LAW. DISSEMINATION TO NON-U.S.
> PERSONS WHETHER IN THE UNITED STATES OR ABROAD REQUIRES AN
> EXPORT LICENSE OR OTHER DETERMINATION.

This lens is used as part of the remote thermal sight for one of the weapons systems on the Abrams tank.

In January, 2007, RMI solicited a bid from MOS to make this lens. On January 18, 2007, as part of this process, RMI sent to MOS RMI Drawing No. 4991064, a version of the Raytheon drawing from which RMI had removed Raytheon's name, drawing number, and the export legend above. In June, 2007, RMI also sent to MOS the original Raytheon drawing for this lens.In March, 2007, Raytheon placed an order for 1,467 of these lenses from RMI. The Raytheon purchase order referenced the DOD contract number and priority rating for which Raytheon was purchasing the lenses, as did RMI's paperwork related to this order. In April, 2007, RMI provided information to Raytheon as part of a supplier capabilities assessment. As part of that process, RMI told Raytheon that "we apply for licenses as required for ITAR products." On June 20, 2007, Raytheon placed an additional order for 3,780 more of these lenses from RMI. During that same month, MOS was shipping these lenses to RMI.

Both Raytheon Company Technical Drawing No. 4991064 and RMI Technical Drawing No. 4991064 constitute technical data covered by Category XII(f) of the USML and therefore required a license before they were exported to South Korea. RMI never obtained an export license before making this export or before providing the drawing to a foreign national working at RMI.

6.    Technical Drawing Titled: "Lens, Boresight," DRS Technologies Drawing No. 13281219 and RMI's Copy

On June 17, 2005, RMI received a purchase order from DRS Optronics, Inc., a division of DRS Technologies (DRS), to produce optics including a boresight lens described in DRS Technologies Drawing No. 13281219. The DRS drawing indicated it was a modification of a

drawing made by the U.S. Army Missile Command. DRS's purchase order specified that the lenses were requested in connection with a priority-rated DOD contract, provided the DoD contract number, and contained the following statement:

> THE TECHNICAL DATA CONTAINED HEREIN MAY BE SUBJECT TO THE U.S. INTERNATIONAL TRAFFIC IN ARMS REGULATION (ITAR) 22 CFR 120-130 OR THE U.S. EXPORT ADMINISTRATION REGULATION (EAR) 15 CFR Parts 730-774 DIVERSION CONTRARY TO U.S. EXPORT LAW IS PROHIBITED.

This lens is used in the optical sight for the TOW missile system.

On or about January 18, 2006, RMI received an order for additional boresight lenses, DRS part number 13281219. On January 18, 2006, RMI created a purchase order to DRS for these boresight lenses. This purchase order was stamped, "ITAR/EXPORT CONTROLLED" and "PRIORITY RATED."

On January 20, 2006, an RMI employee sent a RFQ to Golden Way Scientific (also known as Beijing Golden Way Scientific), Beijing, China ("Beijing Golden Way"). This RFQ asked Beijing Golden Way to provide a quote for "Prism per DWG 13281219-BA (with coating)" and "Same as item #1 except uncoated." This RFQ contained a handwritten reply message from a Beijing Golden Way employee stating "….is impossible for so I give you uncoated quote...Best Regards…."

On February 2, 2006, RMI solicited a quote for the production of these boresight lenses from MOS. In connection with obtaining that quote, RMI sent to MOS RMI Technical Drawing No. 13281219-BA, a version of DRS Drawing No. 13281219 which had been copied by an RMI administrative assistant to remove references to RMI's customer, DRS, as well as those to the U.S. Army Missile Command. On February 3, 2006, a purchase order between RMI and MOS was completed and RMI ordered 500 boresight lenses from MOS. RMI's purchase order

indicated that "THIS IS A DO-A2 RATED ORDER CERTIFIED FOR DEFENSE USE...."

Starting in March 2006, MOS produced the boresight lenses and sent them to RMI.

Both DRS Technologies Drawing No. 13281219 and RMI Drawing No. 13281219-BA constitute

technical data covered by Category XII(f) of the USML and therefore required licenses before

they were exported to China or South Korea. RMI never obtained export licenses before making

these exports.

<u>7.</u>     <u>Technical Drawing Titled: "Mirror, Fold-Reticle," DRS Technologies Drawing No.</u>

<u>13620025 and RMI's Copy</u>

On January 20, 2007, RMI received an RFQ from DRS to produce optics including a

mirror as described in DRS Technologies Drawing No. 13620025. The RFQ included the

following statement:

> This (document/presentation) may contain technical data as defined in the International
> Traffic in Arms Regulations (ITAR) 22 CFR 120.10. Export of this material is restricted
> by the Arms Export Control Act (22 U.S.C. 2751 et seq.) and may not be exported to
> foreign persons without prior written approval from the U.S.. Department of State.

The RFQ also specified that "the supplier shall be in Full Compliance with ITAR Regulations

when sharing Technical Data contained in this Request for Proposal with any Foreign entity."

Finally, the RFQ indicated that the mirror was for use in a priority-rated, DOD contract. This

mirror is used in the Improved Bradley Acquisition System, part of the Bradley Fighting Vehicle.

Drawing No. 13620025 itself contained the following legend:

> **INFORMATION SUBJECT TO EXPORT CONTROL LAWS.** THE ATTACHED
> DOCUMENT(S) MAY CONTAIN TECHNICAL DATA WITHIN THE DEFINITION
> OF THE INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR), AND ARE
> SUBJECT TO THE EXPORT CONTROL LAWS OF THE U.S. GOVERNMENT.
> TRANSFER OF THIS DATA BY ANY MEANS TO A FOREIGN PERSON,
> WHETHER IN THE U.S. OR ABROAD, WITHOUT AN EXPORT LICENSE OR
> OTHER APPROVAL FROM THE U.S. DEPARTMENT OF STATE, IS PROHIBITED.

# Appendix A – Statement of Facts

On February 9, 2007, DRS ordered a total of 243 of these mirrors from RMI. DRS's purchase order specified that the mirrors were requested in connection with a priority-rated DOD contract, and that:

> THE TECHNICAL DATA CONTAINED HEREIN MAY BE SUBJECT TO THE U.S. INTERNATIONAL TRAFFIC IN ARMS REGULATION (ITAR) 22 CFR 120-130 OR THE U.S. EXPORT ADMINISTRATION REGULATION (EAR) 15 CFR Parts 730-774 DIVERSION CONTRARY TO U.S. EXPORT LAW IS PROHIBITED.

In February, 2007, RMI solicited a quote for the production of these mirrors from Beijing Golden Way. In connection with obtaining that quote, RMI sent to Beijing Golden Way RMI Technical Drawing No. 13620025X, a version of DRS Technologies Drawing No. 13620025 which had been copied by an RMI administrative assistant to remove references to RMI's customer, DRS, and the export control legend. On February 26, 2007, RMI sent a purchase order to Beijing Golden Way for 350 of these mirrors. RMI's purchase order indicated that "THIS IS A DO-A4 RATED ORDER CERTIFIED FOR NATIONAL DEFENSE USE." Between April and July of 2007, Beijing Golden Way produced the mirrors, did some of the quality control testing on them, and sent them to RMI.

Both DRS Technologies Drawing No. 13620025 and RMI Drawing No. 13620025X constitute technical data covered by Category XII(f) of the USML and therefore required licenses before they were exported to China. RMI never obtained export licenses before making these exports.

<u>8.</u>    <u>Technical Drawing Titled: "Lens No. 2," DRS Technologies Drawing No. 13620029 and</u>

<u>RMI's Copy</u>

In February, 2007, RMI received an RFQ from DRS to produce optics including a lens as

described in DRS Technologies Drawing No. 13620029.  The RFQ included the following

statement:

> This (document/presentation) may contain technical data as defined in the International
> Traffic in Arms Regulations (ITAR) 22 CFR 120.10.  Export of this material is restricted
> by the Arms Export Control Act (22 U.S.C. 2751 et seq.) and may not be exported to
> foreign persons without prior written approval from the U.S.. Department of State.

The RFQ also specified that "the supplier shall be in Full Compliance with ITAR

Regulations when sharing Technical Data contained in this Request for Proposal with any

Foreign entity."  Finally, the RFQ indicated that the lens was for use in a priority-rated, DOD

contract.  This lens is used in the Improved Bradley Acquisition System, part of the Bradley

Fighting Vehicle.

On February 20, 2007, DRS ordered a total of 354 of these lenses from RMI.  DRS's

purchase order specified that the mirrors were requested in connection with a priority-rated DOD

contract, and that:

> THE TECHNICAL DATA CONTAINED HEREIN MAY BE SUBJECT TO THE U.S.
> INTERNATIONAL TRAFFIC IN ARMS REGULATION (ITAR) 22 CFR 120-130 OR
> THE U.S. EXPORT ADMINISTRATION REGULATION (EAR) 15 CFR Parts 730-774
> DIVERSION CONTRARY TO U.S. EXPORT LAW IS PROHIBITED.

RMI's job order also contained the DOD contract number and priority rating and was stamped,

"ITAR/EXPORT CONTROLLED."

On February 26, 2007, RMI sent a purchase requisition to MOS for 486 of these lens.  At

the same time, RMI sent to MOS RMI Drawing No. 13620029XA, a version of DRS

Technologies Drawing No. 13620029 which had been copied by an RMI administrative assistant to remove references to RMI's customer, DRS, and the export control legend. On January 10, 2006, RMI had previously sent the same drawing, No. 13620029XA, to MOS in connection with another RFQ. In March, 2007, MOS shipped 444 of these lenses to RMI.

Both DRS Technologies Drawing No. 13620029 and RMI Drawing No. 13620029XA constitute technical data covered by Category XII(f) of the USML and therefore required licenses before they were exported to South Korea. RMI never obtained export licenses before making these exports.

9.    Technical Drawing Titled: "Prism 2, Beamsplitter 1," DRS Technologies Drawing No. 13620059 and RMI's Copy

On January 20, 2007, RMI received an RFQ from DRS to produce optics including beamsplitter prism as described in DRS Technologies Drawing No. 13620059. The RFQ included the following statement:

> This (document/presentation) may contain technical data as defined in the International Traffic in Arms Regulations (ITAR) 22 CFR 120.10. Export of this material is restricted by the Arms Export Control Act (22 U.S.C. 2751 et seq.) and may not be exported to foreign persons without prior written approval from the U.S. Department of State.

The RFQ also specified that "the supplier shall be in Full Compliance with ITAR Regulations when sharing Technical Data contained in this Request for Proposal with any Foreign entity." Finally, the RFQ indicated that the prism was for use in a priority-rated, DOD contract. This prism is used in the Improved Bradley Acquisition System, part of the Bradley Fighting Vehicle.

Drawing No. 13620059 itself contained the following legend:

> **INFORMATION SUBJECT TO EXPORT CONTROL LAWS.** THE ATTACHED DOCUMENT(S) MAY CONTAIN TECHNICAL DATA WITHIN THE DEFINITION OF THE INTERNATIONAL TRAFFIC IN ARMS REGULATIONS (ITAR), AND ARE SUBJECT TO THE EXPORT CONTROL LAWS OF THE U.S. GOVERNMENT.

TRANSFER OF THIS DATA BY ANY MEANS TO A FOREIGN PERSON,
WHETHER IN THE U.S. OR ABROAD, WITHOUT AN EXPORT LICENSE OR
OTHER APPROVAL FROM THE U.S. DEPARTMENT OF STATE, IS PROHIBITED.

On February 9, 2007, DRS ordered a total of 243 of these prisms from RMI. DRS's

purchase order specified that the mirrors were requested in connection with a priority-rated DOD

contract, and that:

THE TECHNICAL DATA CONTAINED HEREIN MAY BE SUBJECT TO THE U.S.
INTERNATIONAL TRAFFIC IN ARMS REGULATION (ITAR) 22 CFR 120-130 OR
THE U.S. EXPORT ADMINISTRATION REGULATION (EAR) 15 CFR Parts 730-774
DIVERSION CONTRARY TO U.S. EXPORT LAW IS PROHIBITED.
On February 15, 2007, RMI sent an RFQ and, later, a purchase requisition to Optic Penta

for 300 of these prisms. That same day, RMI sent to Optic Penta RMI Drawing No.

13620059REV-, a version of DRS Technologies Drawing No. 13620059 which had been copied

by an RMI administrative assistant to remove references to RMI's customer, DRS, and the

export control legend. By August, 2007, Optic Penta had begun shipping these prisms to RMI.

Both DRS Technologies Drawing No. 13620059 and RMI Drawing No. 13620059REV-

constitute technical data covered by Category XII(f) of the USML and therefore required

licenses before they were exported to Russia. RMI never obtained export licenses before making

these exports.

10.     Technical Drawing Titled: "Lens No. 3, Biocular Eyepiece," DRS Technologies Drawing

No. SM-D-805009 and RMI's Copy

On January 29, 2006, RMI received a Request for Proposal (RFP) from DRS to produce

optics including lens described in DRS Technologies Drawing No. SM-D-805009. The RFP

contained the following text:

THE SUPPLIER SHALL BE IN FULL COMPLIANCE WITH ITAR REGULATIONS
WHEN SHARING TECHNICAL DATA CONTAINED IN THIS REQUEST FOR
PROPOSAL WITH ANY FOREIGN ENTITY.

## Appendix A – Statement of Facts

> THE TECHNICAL DATA CONTAINED IN THE DOCUMENTS IS CONTROLLED
> BY THE U.S. DEPARTMENT OF STATE. IT MAY NOT BE EXPORTED,
> TRANSFERRED, DIVERTED OR DISCLOSED TO A NATIONAL OF ANOTHER
> COUNTRY WITHOUT THE PRIOR WRITTEN APPROVAL OF THE U.S.
> DEPARTMENT OF STATE.

The RFP indicated that the lens was for use in a priority-rated, DOD contract. This lens is used in the Improved Bradley Acquisition System, part of the Bradley Fighting Vehicle.

DRS Technologies Drawing No. SM-D-805009 indicated that it was originally a DOD drawing and was marked with the following legend:

> This (document/presentation) may contain technical data as defined in the International Traffic in Arms Regulations (ITAR) 22 CFR 120.10. Export of this material is restricted by the Arms Export Control Act (22 U.S.C. 2751 et seq.) and may not be exported to foreign persons without prior written approval from the U.S.. Department of State.

On February 6, 2007, MOS provided an estimate to RMI which specifically referenced the drawing that describes this lens.

On March 14, 2007, RMI forwarded to MOS an email with a copy of the DRS drawing. In an internal email between RMI employees, the following statement was included :

**"REMEMBER everything I've been sending you from DRS is ITAR controlled."** The RMI employee who received that email eventually forwarded it to MOS with a copy of the drawing. DRS began ordering these lenses from RMI in March, 2007, and ultimately ordered over 600 of them. RMI's job orders for this part were all stamped, "ITAR/EXPORT CONTROLLED."

In April, 2007, RMI in turn ordered these lenses from MOS. At least one foreign national participated in subsequent discussions about the acceptability of a coating for the lenses different than the one specified in the DRS drawing. On August 2, 2007, RMI sent MOS RMI Drawing No. SM-D-805009, a version of DRS Technologies Drawing No. SM-D-805009 which

had been copied by an RMI administrative assistant to remove references to RMI's ultimate customer, DRS, and the export control legend.

Both DRS Technologies Drawing No. SM-D-805009 and RMI Drawing No. SM-D-805009 constitute technical data covered by Category XII(f) of the USML and therefore required licenses before they were exported to South Korea.   RMI never obtained export licenses before making these exports or before showing the drawings to a foreign national.

Representatives of Northrup Grumman, Lockheed Martin, Raytheon, and DRS have all indicated that RMI neither requested permission nor notified them that it intended to or was performing any part of its work for them using foreign companies or persons.